Slip Op. 12-69

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| FUWEI FILMS (SHANDONG) CO., LTD., | |
| Plaintiff, | |
| v. | Before: Leo M. Gordon, Judge |
| UNITED STATES, | Consol. Court No. 11-00061 |
| Defendant. | |

**OPINION and ORDER**

[Administrative review results remanded.]

Dated: June 1, 2012

David J. Craven, Riggle & Craven, of Chicago, IL, for Plaintiffs Fuwei Films (Shandong) and Shaoxing Xiangyu Green Packing Co., Ltd.

David D'Alessandris, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With him on the brief were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director and Patricia M. McCarthy, Assistant Director.  Of Counsel on the brief was Whitney Rolig, Office of the Chief Counsel for Import Administration, International Trade Administration, Department of Commerce, of Washington, D.C.

Ronald I. Meltzer, Patrick J. McLain, David M. Horn, and Jeffrey I. Kessler, Wilmer, Cutler, Pickering, Hale and Door, LLP, of Washington, DC, for Defendant-Intervenors DuPont Teijin Films, Mitsubishi Polyester Film, Inc., SKC, Inc., and Toray Plastics (America), Inc.

Gordon, Judge:  This consolidated action involves an administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering Polyethylene Terephthalate ("PET") Film from the People's Republic of China.  See Polyethylene Terephthalate Film from the People's Republic of China,

76 Fed. Reg. 9,753 (Dep't of Commerce Feb. 22, 2011) ("Final Results") and accompanying Issues and Decision Memorandum, A-570-924 (Feb. 14, 2011), available at http://ia.ita.doc.gov/frn/summary/prc/2011-3909-1.pdf (last visited June 1, 2012) ("Decision Memorandum").  Before the court are motions for judgment on the agency record filed by Fuwei Films (Shandong) Co., Ltd., and Shaoxing Xiangyu Green Packing Co., Ltd. ("Green"), respondents in the administrative proceeding (collectively "Respondents"), and DuPont Teijin Films, Mitsubishi Polyester Film, Inc., SKC, Inc., and Toray Plastics (America), Inc. (collectively "DuPont"), petitioners in the administrative proceeding.  The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[1] and 28 U.S.C. § 1581(c) (2006).

Respondents challenge Commerce's (1) surrogate valuation of labor inputs, (2) alleged clerical errors for Green's packing material and per-unit electricity and water, and (3) surrogate valuation of PET chips.[2]  DuPont also challenges the surrogate valuation of Respondents' PET chips.  For the reasons set forth below, this matter is remanded to Commerce.

## I. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains determinations, findings, or conclusions of the U.S. Department of Commerce unless

---

[1] Further citation to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

[2] PET chips are the primary raw material for production of PET film.

they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.  3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d. ed. 2011).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2010).

## II. Discussion

### A. Voluntary Remand

Commerce has requested a voluntary remand to (1) address Respondents' arguments regarding the surrogate value for the labor input, and (2) correct a clerical error in Green's per-unit water and electricity costs, which the court will grant.  See SKF USA Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001).

### B. Green's other Clerical Error Allegation

When calculating Green's packing material expenses for the preliminary results, Commerce included a space between a parenthesis and a slash mark in a line of computer code.  Green did not raise this issue in its case brief, nor did Green raise the issue as a clerical error submission following issuance of the Final Results.  Green has instead raised this issue for the first time in its opening brief in this action, alleging that the extra space caused an error in the conversion (or non-conversion) of units from tons to kilos.

The extra space actually has no effect whatsoever on the calculation.  Defendant explains that the software computes each instruction line as a whole.  Def.'s Br. at 16 n. 5, Nov. 30, 2011, ECF No. 55 (quoting SAS Institute, Inc., SAS 9.3 Language Reference: Concepts 21 (Cary, NC SAS Institute, Inc. 2011) ("A blank [space] is not treated as a character in a SAS statement unless it is enclosed in quotation marks . . . [t]herefore, you can put multiple blanks any place in a SAS statement where you can put a single blank.  It has no effect on the syntax.").  In its reply brief, Green raises an

entirely new argument about an apparently different clerical error affecting the converted or calculated weight of Green's plastic caps.  See Respondents' Reply Br. at 11-12, Jan. 4, 2012, ECF No. 58-1 ("Plaintiffs initially believed that this error was reflected in the identified instruction.  Apparently it was not.").  The time of one's reply brief, however, is not the opportune moment to figure out the specifics of one's argument, and introduce a brand new theory.  See Scheduling Order at 6, July 14, 2011, ECF No. 36 ("The reply brief may not introduce new arguments.").  The court will therefore sustain Commerce's treatment of Green's packing expenses.

### C. Surrogate Valuation of PET Chip Inputs

When valuing the factors of production in a non-market economy proceeding, Commerce must use the "best available information" when selecting surrogate data from "one or more" surrogate market economy countries.  19 U.S.C. § 1677b(c)(1), (4).  Commerce's regulations provide that surrogate values should "normally" be publicly available and from a single surrogate country.    19 C.F.R. § 351.408(c) (2008).  Commerce prefers data that reflects a broad market average, is publicly available, contemporaneous with the period of review, specific to the input in question, and exclusive of taxes on exports. Certain Pneumatic Off–the–Road Tires from the People's Republic of China, 73 Fed. Reg. 40,485 (Dep't of Commerce July 15, 2008) and accompanying Issues and Decision Memorandum cmt. 10 at 26, A–570–912 (July 7, 2008), available at  http://ia.ita.doc.gov/frn/summary/PRC/E8–16156–1.pdf  (last visited this date).

"[T]he process of constructing foreign market value for a producer in a nonmarket economy country [using surrogate values] is difficult and necessarily imprecise." Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (citation omitted) (internal quotation marks omitted).  Importantly, Commerce's surrogate value decision or data choice is not rendered unreasonable because an alternative inference or conclusion could be drawn from the administrative record.  Daewoo Elec. Co. v. Int'l Union of Elec., Elec., Tech., Salaried & Mach. Workers, 6 F.3d 1511, 1520 (Fed. Cir. 1993).  Rather, the court will upset Commerce's surrogate valuation only if no "reasonable mind could conclude that Commerce chose the best available information." Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (quoting Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006)) (internal quotation marks omitted).

In determining the "best available information" to value Respondents' PET film inputs of bright polyester and master batch ("BP&MB") PET chips, Commerce needed to determine which provision of the Harmonized Tariff Schedule ("HTS") of India (the primary surrogate country) best applied to Respondents' BP&MB chips.  This was an involved undertaking:

> When selecting surrogate values with which to value the FOPs used to produce subject merchandise, the Department is directed to use the "best available information" on the record. See Section 773(c)(1) of the Act. As noted by Petitioners, when selecting surrogate values for use in an NME proceeding, the Department's preference is to use, where possible, a range of publicly available, non-export, tax-exclusive, and product-specific prices for the POR, with each of these factors applied non-hierarchically to the particular case-specific facts and with preference to data from a single

surrogate country. In the <u>Preliminary Results</u>, the Department selected a surrogate value based on an eight-digit basket category that was the most specific on record to the input in question. The Department valued PET chips with HTS 3907.60.20, "Polyethylene Terephthalate With Intrinsic Viscosity >= 0.64 Dl/G & <=0.72 Dl/G," the HTS subheading applicable to Respondents' FOPs for PET chips with the intrinsic viscosity meeting this description. However, the Department has reviewed the additional factual information placed on the record by Respondents regarding the methodologies employed for measuring intrinsic viscosity and, after further review of the certificates of analysis submitted by Respondents, the Department has determined that there is insufficient evidence on the record to support the selection of HTS 3907.60.20 as the only surrogate value for the inputs that comprise all, or nearly all, of Respondents' direct materials, and the great majority of Respondents' cost of manufacturing. Therefore, for the final results, the Department has determined to use the GTA Indian import data under both HTS subheadings 3907.60.10 and 3907.60.20. Data for both subheadings are publicly available, broad market averages, contemporaneous with the POR, tax-exclusive, and representative of significant quantities of imports, thus satisfying critical elements of the Department's surrogate value test.

Respondents have argued that the customs service of the Indian government uses a different testing methodology for calculating intrinsic viscosity than those used by Respondents in their questionnaire responses. Information on the record regarding testing methods in India, <u>i.e.</u>, a letter from an Indian customs official secured by Respondents' counsel during the less than fair value investigation, indicates that to correctly classify merchandise entering India, importers should have intrinsic viscosity details for their product(s) based on ASTM standards. The letter, dated April 7, 2008, was written only six months prior to the beginning of the POR. Further, Respondents have also submitted information regarding intrinsic viscosity testing methods commonly used in the PRC, which are testing methods conforming to those set forth by ISO, but which are not the same as the ASTM testing protocol for measuring PET chip intrinsic viscosity used in India. Finally, the Department has reviewed the submission of the DuPont Group, respondents in the investigation, which Respondents submitted to the record of this review subsequent to the <u>Preliminary Results</u>. In the investigation, the DuPont Group submitted to the public record a list of its suppliers, the PET chips that it purchased from each supplier, the PET chip intrinsic viscosity by the suppliers' specification and, finally, conversions of these intrinsic viscosity values to demonstrate what the values would be using other testing

methods. Thus, Respondents' submitted factual information indicates that there are several different testing methods for measuring the intrinsic viscosity of PET chips, which differ based upon the nature and proportion of solvents used in the testing process. The actual testing method used to measure the intrinsic viscosity of PET chips is done at the discretion of the tester. Depending upon the testing method used, the intrinsic viscosity of PET chips could be measured either above or below the 0.64 Dl/G threshold which defines HTS 3907.60.20.

The record evidence in this review supports the Department's use of HTS 3907.60.20 as we concluded in our Preliminary Results. Nevertheless, we reviewed again the certificates of analysis that Respondents submitted to the record prior to the Preliminary Results, and it appears from the record that the testing method used by Respondents' suppliers to provide the intrinsic viscosity values reported on the certificates is not disclosed. Further, the certificates of analysis for Respondents' PET chips indicates that at least some of Respondents' PET chips have an intrinsic viscosity very near the 0.64 Dl/G threshold which defines the upper limit of HTS 3907.60.10, and the lower limit of HTS 3907.60.20. Due to the absence of record evidence that would provide the Department with information for determining the correct intrinsic viscosity and the most accurate HTS subheading, the Department believes that some of Respondents' PET chips match the description for HTS 3907.60.10. Moreover, as the bright polyester chip FOP and master batch chip FOP make up the vast majority of the cost of manufacturing for Respondents, it is critical in this instance that the Department applies a comprehensive valuation for the inputs at issue.

Respondents and Bemis have noted various PET chip quantity and value examples on the record for other India HTS subheadings, and argued that the quantity in the surrogate value used in the Preliminary Results (i.e., HTS 3907.60.20) is lower when compared to these examples. In particular, Respondents have contrasted the quantity of HTS 3907.60.20 with the greater merchandise quantity of HTS 3907.60.10, the HTS subheading used to value DuPont Group's PET chip input in the original investigation. Respondents have presented information showing that the adjacent HTS 3607.60.10 represents a more reliable quantity than the Indian HTS 3907.60.20. Generally, the Department's practice has found that the existence of lower commercial quantities and higher prices alone does not necessarily indicate that price data are distorted or misrepresented and, thus, are not sufficient to exclude particular surrogate values absent specific evidence that the values are otherwise aberrational.

Moreover, as stated in the preceding paragraph, the Department has determined to apply an equal balance of all surrogate values that are, or could potentially be applicable to, Respondents' PET chips. Therefore, due to: (1) the reasonable likelihood that Indian HTS 3907.60.10 may be applicable, at least in part, to Respondents' inputs; and (2) the magnitude of the surrogate value in relation to Respondents' cost of production, the Department has applied the simple-average of the two weighted-average unit values of Indian HTS subheadings 3907.60.10 and 3907.60.20 to calculate the surrogate values for bright polyester chips and master batch chips in order to calculate as accurately as possible Respondents' antidumping margins for the final results. The information on the record supports a finding that both HTS subheadings may be equally applicable to Respondents' inputs. The Department has applied the simple-average of the two weighted-average unit values of the Indian HTS subheadings 3907.60.10 and 3907.60.20, and not a weighted-average unit value of all merchandise under these HTS subheadings, to avoid an imbalanced result due to the greater merchandise quantity of HTS 3907.60.10.

Finally, Respondents have submitted Infodrive India data as a corroborative tool to show that the GTA surrogate value data are distorted. Due to the Department's well-established reservations regarding the use of Infodrive data, either as a corroborative tool or price benchmark, the viability of this particular Infodrive dataset (and, thus, Respondents' claims that the GTA data are distorted) must be analyzed in accordance with Department practice and policy regarding the use of Infodrive data. The Department has stated that it will consider Infodrive data to further evaluate import data, provided: (1) there is direct and substantial evidence from Infodrive reflecting the imports from a particular country; (2) a significant portion of the overall imports under the relevant HTS category is represented by the Infodrive India data; and (3) distortions of the surrogate value in question can be demonstrated by the Infodrive data; but that the Department will not use Infodrive data when they do not account for a significant portion of the imports which fall under a particular HTS subheading.

On point (1), all countries but one that are reported in GTA for HTS 3907.60.10 are reported in the Infodrive data, and the Infodrive data for HTS 3907.60.20 do indicate shipments from Germany to India as shown in GTA. Regarding point (2), we find that the Infodrive India is under-inclusive, representing only 48.44 percent of POR value and 53.05 percent of POR quantity for Indian HTS 3907.60.10, and only 79.16 percent of POR value and 84.72 percent of POR quantity for Indian HTS

3907.60.20, as reported in the official source. Over half of the value in HTS 3907.60.10, and one-fifth of the value in HTS 3907.60.20, based on official Indian import statistics is not accounted for by the Infodrive. Information in this unaccounted for portion of the actual entries may contradict the claim that these HTS numbers produce a distortive average value. In numerous cases, the Department has rejected Infodrive data because they did not account for a significant portion of the overall official import data. If the Department considers that Infodrive information is not conclusive regarding the validity of the surrogate value based on HTS 3907.60.10 and HTS 3907.60.20, the Department may continue to apply the surrogate value. As to point (3), Respondents and Bemis have not provided any benchmarks to show that the AUVs are abnormally high or the quantity is abnormally low. Furthermore, Infodrive India data are collected by a private party that only reviews bills of lading for commercial descriptions. The data in Infodrive may differ from the actual entries of the shipments as recorded in the Indian official import statistics.

In sum, the Department has applied the simple average of the two weighted-average unit values of the Indian HTS subheadings 3907.60.10 and 3907.60.20 to calculate the surrogate values for bright polyester chips and master batch chips for the final results. Further, Respondents' submitted Infodrive India data are not a reliable basis for the Department to abandon the surrogate value calculated by the Department in the Preliminary Results, as doing so would require a speculative interpretation of the data, and also because the data are an under-inclusive portion of the officially reported Indian import data. Therefore, because there is insufficient evidence that Indian HTS 3907.60.20 should be used exclusively for valuing Respondents' PET chips, as mentioned above for the final results, we will value Respondents' PET chip inputs using Indian import statistics HTS subheadings 3907.60.10 and 3907.60.20.

Because the Department has not departed from its selection of India as the surrogate country and has maintained the application of the selected surrogate value from India for PET chips in this AR, the Department need not address Respondents' arguments against the application of surrogate values from Thailand, and surrogate values from other potential surrogate countries that may or may not have been properly translated.

Decision Memorandum at 12-16 (footnotes omitted).

Both Respondents and DuPont challenge Commerce's surrogate valuation of

Respondent's PET chips as the "best available information," 19 U.S.C. § 1677b(c)(1).

DuPont argues that the administrative record supports HTS 3907.60.20 as the one, true, correct data source for Respondents' PET chips, while Respondents argue that HTS 3907.60.10 is the one, true, correct data source.

During the review Respondents submitted test certificates from their suppliers that showed intrinsic viscosities ("IVs") between 0.64 and 0.72 dl/g, placing them squarely under HTS 3907.60.20 if the testing method (ISO or ASTM) is ignored.  The certificates did not identify the testing method used to calculate the IVs.  Respondents addressed this problem indirectly by relying on submissions from the investigation that had been provided by the "DuPont Group," which consisted of the participating mandatory respondent, DuPont Teijin Films China Limited, together with DuPont Teijin Hongji Films Ningbo Co., Ltd., and DuPont-Hongji Films Foshan Co., Ltd.—all apparent affiliates of the petitioner here, DuPont Teijin Films.  In the investigation the DuPont Group argued, and Commerce agreed, that the correct surrogate value measure was 3907.60.10, not 3907.60.20.  Issues and Decision Memorandum for Final Determination of Sales at Less than Fair Value: Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China at 2-3, A-570-924 (Sept. 17, 2008), available at http://ia.ita.doc.gov/frn/summary/prc/E8-22454-1.pdf (last visited this date).  The DuPont Group (1) explained and documented that ISO tests produce higher IVs than ASTM tests, and (2) submitted detailed charts recalculating the DuPont Group's IVs under ASTM standards. Commerce, though, did not address these submissions, relying on different reasons to favor HTS 3907.60.10 over 3907.60.20 (import statistics for

3907.60.20 contained an insignificant quantity of imports not representative of the DuPont Group's PET chip purchase volume or consumption experience).  Id.  With this background in mind, the court first addresses DuPont's arguments, then Respondents'.

### 1. DuPont's Arguments

At the outset, the court must note that DuPont has assumed a somewhat difficult position by arguing that HTS 3907.60.20 constitutes the only proper dataset (for Respondents PET Chips) shortly after the DuPont Group successfully argued in the investigation that HTS 3907.60.10 is the only proper dataset (for the DuPont Group's PET chips).  Here the main thrust of DuPont's argument is that Commerce's decision to include HTS 3907.60.10 in its surrogate valuation is conjectural.  See DuPont Br. at 5-8, ECF No. 46-2.  "Conjecture" though is not really a word that springs to mind after reading Commerce's detailed analysis quoted above, which does not appear to be the product of mere guesswork.  DuPont's contention is also a surprising, if unfair, characterization given the position the DuPont Group assumed in the investigation.

DuPont argues that Commerce's conclusion that the ISO standard is "commonly" used in China (and by extension, Respondents) is conjecture. DuPont Br. at 5-7. DuPont builds its argument from a cherry-picked statement in China Nat'l Machinery Import & Export Corp. v. United States, 27 CIT 255, 268, 264 F. Supp. 2d 1229, 1240 (2003) ("CMC I"), "Conjectures are not facts and cannot constitute substantial evidence."  DuPont, however, neglects to cite or discuss the subsequent history of CMC I, in which Commerce maintained its original position on remand, Court No. 01-

01114, May 16, 2003, ECF No. 40, which the court then sustained as reasonable despite its earlier (and ultimately unfounded) concerns about potential "conjecture." See China Nat'l Machinery Import & Export Corp. v. United States, 27 CIT 1553, 293 F. Supp. 2d 1334 (2003), aff'd without opinion, 104 Fed. Appx. 183 (Fed. Cir. 2004). CMC I, therefore, has limited persuasive value given its subsequent history.

Here, the question is not whether Commerce engaged in "conjecture" that fails to qualify as "substantial evidence," or that Commerce predicated its decision on mere "suspicion," DuPont Br. at 5-8, (characterizations that are hard to justify given Commerce's detailed analysis above as well as the results of the investigation), but simply whether Commerce's findings and conclusions supporting its ultimate determination to use data from HTS 3907.60.10 are reasonable given the circumstances presented by the record.  DuPont argues that Commerce's conclusion that Chinese producers "commonly" use the ISO standard is unreasonable because the administrative record did not contain direct evidence that the ISO standard is universally used in China.  DuPont's insistence upon direct evidence is an unusual stance in a proceeding in which Commerce determines "surrogate" values that substitute for the direct evidence of a respondent's own accounting.  It is all the more curious because the statute does not require, nor have the courts imposed, a requirement of evidentiary exactitude for Commerce's surrogate valuations.

If framed in absolutes, DuPont is correct that the administrative record does not establish that everyone in China always uses the ISO standard.  The record also does

not establish that the ISO standard is <u>never</u> used in China.   Judicial review of Commerce's action here does not depend on absolutes like always or never, but instead on whether Commerce's inference about Respondents' ISO utilization is reasonable given the information on the administrative record.   It is.   As Defendant explains, any lack of documentation explicitly linking Respondents' inputs to the ISO testing method is balanced by the DuPont Group information from the investigation[3] demonstrating that Chinese PET chip producers generally use the ISO method, and have done so for the models of PET chip that Respondents consumed.   <u>Decision Memorandum</u> at 13.

DuPont also relies on <u>Peer Bearing Company-Changshan v. United States</u>, 35 CIT ___, ___, 752 F. Supp. 2d 1353, 1369-71 (2011) to argue that if Commerce was uncertain about which Indian HTS subheading to apply, it was obligated to explain why that data was superior to Thai surrogate value data.   <u>Peer Bearing</u>, though, is not applicable here.   In <u>Peer Bearing</u> the court determined Commerce's preference for using data from a single country unreasonable when the data was demonstrably aberrational as compared to certain benchmark prices, and alternative data sources could be better corroborated.   The issue here focuses on which HTS category is most appropriate, not whether the values reported for the HTS categories are aberrational.

For the foregoing reasons the court believes DuPont's arguments regarding

---

[3] Respondents submitted the information from the investigation on the record of the administrative review.

Commerce's surrogate valuation of Respondents PET chips lack merit.   Given the

information on the administrative record, it was reasonable for Commerce to include

data from HTS 3907.60.10 in its surrogate valuation of Respondents' PET chips.   The

question remains, though, whether a reasonable mind would conclude on this

administrative record that data from HTS 3907.60.10, and that provision alone, is the

best available information to value Respondents' PET chips, or, if not, whether a

reasonable mind would conclude that Commerce's simple average of the two HTS

provisions constitutes the best available information.

### 2. Respondents Arguments

Respondents contend that Commerce's use of unconverted IV levels from China

for Indian HTS subheadings is unreasonable (unsupported by substantial evidence), as

is Commerce's use of an un-weighted (simple) average of Indian HTS 3907.60.10 and

Indian HTS 3907.60.20 as the basis for the surrogate value.   Commerce ultimately

determined that a "broader" straddling of import data for HTS 3907.60.10 and HTS

3907.60.20 is the best available information of Respondents' PET chip value, and that

reliance upon the data for only one or the other HTS provisions, or a weighted average

of both, is not a better surrogate.   The court has identified three specific infirmities that

challenge the reasonableness of Commerce's determination, each of which requires

further explanation or reconsideration by Commerce.

First, Respondents relied on a summary chart prepared by the DuPont Group in

the investigation covering the ISO-to-ASTM conversions of the models of PET chips

Respondents purchased from certain of the listed suppliers.  See, e.g., Respondents'

Br. at 8-9 (citing PD 137 at Ex. PSV-8, Ex. 6-H (frm 468) and 6-I (frms 470-71)).

Considering the record and the arguments, Commerce agreed that Respondents had

provided additional information showing that "HTS 3607.60.10 represents a more

reliable quantity than the Indian HTS 3907.60.20" and Commerce found a "reasonable

likelihood" that Indian HTS 3907.6010 may apply to "some" of Respondents' PET chips.

Decision Memorandum at 13-14.  This requires amplification.

Commerce's statement could be construed as a distinction between

Respondents' BP&MB and PETG chip model purchases, but the test report for the latter

shows an IV level far in excess of even the upper limit of HTS 3907.60.20, implying that

HTS 3907.60.90 (without regard to the product's IV level) would be the correct

classification for that model.  Commerce's stated focus for purposes of valuing

Respondents' factors of production, of course, is the IV levels of Respondents' BP&MB

chips.  Each of the test reports for the BP&MB chips declares a single IV level, without

indication of uncertainty or standard deviation.  If one accepts the logic that the proper

classification of Respondents' BP&MB chips in India requires conversion from

ISO (China) to ASTM (India), then why are only "some" and not all of those chips

considered within HTS 3907.60.10?  And why does that logic also not undermine the

reasonableness of any continued reliance upon the "stated" facial declarations of the IV

levels on the BP&MB chip test reports?

The second matter requiring clarification is Commerce's consideration of the

record data for HTS 3907.60.20, and specifically Commerce's finding on the unreliability

of Infodrive data to corroborate that data.   As a matter of practice, Commerce may

consider Infodrive data as a corroborative tool when (1) there is direct and substantial

evidence from Infodrive reflecting the imports from a particular country; (2) a significant

portion of the overall imports under the relevant HTS category is represented by the

Infodrive data; and (3) distortions of the surrogate value in question can be

demonstrated by the Infodrive data.  Decision Memorandum at 15 (citing Lightweight

Thermal Paper from the People's Republic of China, 73 Fed. Reg. 57,329 (Dep't of

Commerce Oct. 2, 2008) (final LTFV determination) and accompanying Issues and

Decision Memorandum at cmt. 9, A-570-920 (Sept. 25, 2008), available at

http://ia.ita.doc.gov/frn/summary/prc/E8-23271-1.pdf (last visited this date)).   Applying

that framework here, Commerce concluded that the Infodrive data satisfied the first

prong, but not the second.   Commerce, therefore, declined to consider the Infodrive

data.  Decision Memorandum at 16.  More specifically, Commerce found the Infodrive

data for HTS 3907.60.10 under-inclusive as it represented only 48.44 percent of period

of review by value and 53.05 percent of period of review by quantity as compared with

GTA data.   This finding was reasonable under Commerce's framework.   However,

Commerce's finding that the Infodrive data for HTS 3907.60.20 could also not be used

as a corroborative tool requires further clarification for two reasons.

       First, Commerce concluded the data under-inclusive because they represented

"only" 79.16 percent by value and 84.72 percent by quantity for HTS 3907.60.20.  Id. at

15.  As support, Commerce cited Lightweight Thermal Paper.  In Lightweight Thermal Paper, however, Commerce accepted Infodrive data that represented 88 percent of the quantity of country-specific imports.  Why does Commerce consider import quantity data covering slightly less than 85 percent unreliable, but 88 percent reliable?

Second, Respondents explained that (1) all of the Infodrive data for HTS 3907.60.20 for this period of review consisted of non-PET product exported from Germany (Respondents' Br. at 12-13), (2) there is no evidence in the record of what product the "missing" data pertained to (15.28 percent by quantity), (3) the quantity represented by the "missing" data would be consistent with less than one full shipment, (4) the Infodrive data from the investigation showed that the imports were of the same non-PET material, and (5) even if all of the unidentified material in HTS 3907.60.20 (totaled over a 12-month period) were PET chips, the most that such quantity could be is 8.20 metric tons, or nearly half of the quantity (totaled over a six-month period) that Commerce rejected in the original investigation as insignificant.  These appear to be sound arguments testing the reasonableness of Commerce's unwillingness to consider as corroboration, the Infodrive data for HRS 3907.60.20.  Commerce needs to provide an explanation that takes these considerations into account.

These arguments, in turn, also lead to the third and final matter requiring further explanation: Commerce's use of a simple (as opposed to weighted) average of the two HTS data sets.  Because Commerce applied the simple average for the first time in the Final Results, Respondents did not have the opportunity to challenge that decision

during the administrative review.   In their briefs before the court, Respondents have raised legitimate concerns that test the reasonableness of Commerce's use of a simple average, which according to Respondents, gives "inordinate weight to a provision [HTS 3907.60.20] with very small quantities [that] also does not consist of the kind of goods [that] comprise the factor of production."   Respondents' Reply Br. at 8.   Commerce needs to address the arguments raised by Respondents, see Respondents' Br. at 14-17; Respondents' Reply Br. at 8.

### III. Conclusion

Accordingly, it is hereby

**ORDERED** that this action is remanded to Commerce to address Respondents' submissions regarding the surrogate valuation of its labor inputs, as well as the inadvertent transposition of Green's per-unit consumption levels for water and electricity; it is further

**ORDERED** that the Final Results are sustained with respect to Commerce's calculation of Green's packing material expenses; it is further

**ORDERED** that Commerce on remand clarify or reconsider, as appropriate, the issues the court identified regarding Commerce's surrogate valuation of Respondents' PET chips; it is further

**ORDERED** that Commerce shall file its remand results on or before August 1, 2012; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.


                                                          /s/ Leo M. Gordon
                                                          Judge Leo M. Gordon

Dated: June 1, 2012
          New York, New York